UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
JOSEPH HENNESSY,                        )
                                        )
         Plaintiff,                     )
                                        )
v.                                      )         Civil No. 17-cv-12566-LTS
                                        )
HILL-ROM COMPANY, INC.                  )
                                        )
         Defendant.                     )
_____)

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 59)

November 30, 2020

SOROKIN, J.

         Plaintiff Joseph Hennessy filed this employment discrimination action against his former

employer, Defendant Hill-Rom Company, Inc. ("Hillrom"), alleging two violations under Mass.

Gen. Laws ch. 151B, § 4 as well as a violation of the covenant of good faith and fair dealing. See

Doc. No. 1-1.[1] Hillrom moved for summary judgment. Doc. No. 59. Hennessy opposed the

motion, Doc. No. 81, Hillrom filed a reply, Doc. No. 88, and the Court held a hearing on

November 17, 2020. After careful consideration of the parties' briefs and arguments, Hillrom's

Motion for Summary Judgment is ALLOWED.

## I.    FACTS

         Hillrom designs, manufactures, and services hospital beds and stretchers, as well as other

medical-related accessories, devices, and products. Doc. No. 61 ¶ 1. Hillrom hired Hennessy to

work as an Account Executive in 2007. Id. ¶ 2. Hennessy's job duties included selling or renting

_____
[1] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing
system; pincites are to the page numbers in the ECF header.

Hillrom's products and services to hospitals and medical facilities within his assigned territory. Id. ¶ 3. Hennessy was paid a regular wage and was also eligible to earn commissions from sales in his region when a customer accepted a purchase order and paid for the products or services provided. See Doc. No. 61-1 at 7. Hillrom required Hennessy to meet sales and rental goals each fiscal year, and his performance was evaluated based on his ability to meet these goals. See Doc. No. 61-3 at 53–54. The fact that Hennessy's performance was evaluated each year in writing is undisputed, as are the contents of the reviews themselves.

From 2008 to 2011, Hennessy's first few years as an Account Executive, his managers gave him an overall rating of "Meets Expectations" while noting areas where he fell short of various sales or rental goals. See Doc. No. 61-3 at 61, 68, 74; Doc. No. 61-4 at 44. In his 2008 review, Hennessy's manager Greg Zenko observed that he "had a very good first year" but only achieved 76.2% of his annual sales goal. Doc. No. 61-3 at 60. In 2009, Hennessy achieved only 40% of his annual sales goal. Id. at 65. Zenko commented, "you[r] results this year were well below company and I know your expectations." Id. The following year, 2010, Hennessy achieved only 45.6% of his sales goal and 85.3% of his rental goal. Id. at 70. Hennessy's manager wrote: "He will need to show improvement in his results for 2011 and . . . prove that he can work within the team environment." Id. at 75. In 2011, Hennessy achieved his capital goal for the first time, but still fell short of his rental goal. See Doc. No. 61-4 at 41.

Beginning in 2012, Hennessy's managers began to flag more serious concerns with his performance. In 2012, he was given an overall rating of "Does Not Meet Expectations" after achieving only 47% of his sales goal and 63% of his rental goal. Doc. No. 61-3 at 78, 81. In the review, Hennessy's manger wrote: "2012 was a challenging year for you" and "you experienced . . . decline in capital and failed to make even one segment" of the annual goals. Id. at 78. These

2

performance issues continued into 2013—in Hennessy's 2013 mid-year review, his manager wrote that he "has lots of activity and few results to show for it" and "needs to find a way to get to 100% in capital and needs to be involved in the rental business." Id. at 83.

On July 27, 2013, Jeffrey Philbrick became Hillrom's Area Vice President of Sales overseeing territories throughout New England and upstate New York. Doc. No. 61 ¶ 26. From that point, Philbrick was Hennessy's manager. Id. ¶ 27. In his first evaluation of Hennessy, at the end of 2013, Philbrick found Hennessy's performance was "[o]verall, below expectations," as Hennessy had only achieved 86% of his sales goal and 89% of his rental goal. Doc. No. 61-3 at 85. Philbrick reminded Hennessy that "hitting goal is the minimum expectation." Id. at 89. Philbrick evaluated Hennessy again for a midyear review in April 2014, where he rated him as "Off-Track" and noted that Hennessy was "struggling in many areas including performance to goal and finding deals in competitive accounts." Id. at 90.

Following this review, Philbrick placed Hennessy on a Performance Improvement Plan ("PIP") on June 11, 2014. Id. at 91. The PIP identified areas of concern and steps Hennessy should take to improve his performance, including building a pipeline of potential clients and improving teamwork and communication skills. Id. at 91–93. The PIP included language informing Hennessy that it "will serve as notification that your job is in jeopardy" and that "[i]f you fail to meet all the requirements of this PIP and maintain acceptable performance, you will be terminated." Id. at 93. The PIP was unsuccessful—by the end of 2014, Hennessy had the lowest sales performance of the five Account Executives in Philbrick's region. Doc. No. 61-6 at 2, 4. Philbrick gave him an overall rating of "Does Not Meet Expectations" in the end of year review on October 21, 2014. Doc. No. 61-3 at 117. Philbrick wrote:

> Joe had a bad year to goal and I have tried to work with him to improve several
> aspects of his approach to business. His communication is lacking and he struggles

with the ability to strategically work deals to drive value and get things to close. I
have concerns that Joe can make this work and have him currently working on a
performance improvement plan to address these concerns. Joe will need to work
extremely hard to turn this around and get back on track.

Id.  Ultimately, Hennessy's employment with Hillrom was terminated on January 5, 2015. Doc.

No. 1-1 ¶ 11.

Hennessy puts before the Court several additional facts for summary judgment. First, he

states that Philbrick commented, once, "[H]ow refreshing it is to see a young sales force." Doc.

No. 80 ¶ 58. Hennessy also states that a former colleague, Dave Iglehart, told Hennessy that

Philbrick said that "he wanted to get women into the [Account Executive] position versus men."[2]

Id.; Doc. No. 61-3 at 32. Hennessy notes that he was replaced at Hillrom by a woman. Doc. No.

80 ¶ 59. In addition, Hennessy alleges that he was terminated so that he would not receive

commissions from a substantial deal with Steward Health Care, an operator of Massachusetts

hospitals. See Doc. No. 81 at 3. The undisputed evidence establishes that Steward Health Care

was part of Hennessy's region and a deal was in progress before Hennessy left, Doc. No. 60 ¶¶

43–44, however, Steward ultimately did not sign any deal with Hillrom, id. ¶ 44. Hennessy

claims that his termination was the reason the deal fell through. He provides an undated note

from a former Steward employee, Robert Irvine (the "Irvine note"), which states that "Steward

Health would have signed the Full Service Agreement including On-Schedule and Preventative

Maintenance if Mr. Hennessy had remained employed by Hill-Rom." Doc. No. 61-3 at 118.

Irvine voluntarily left Steward around the same time that Hennessy was terminated. Doc. No. 61-

5 at 21–22. At oral argument, Plaintiff conceded the obvious—that Plaintiff has no evidence that

---

[2] Hennessy does not provide a date for either comment; the only timing he provides is that
Philbrick's comment about a young sales force occurred "sometime in October." See Doc. No.
61-3 at 33.

Irvine attended any meeting between Steward and Hillrom after Hennessey's termination. Hennessy also alleges that contract documents were prepared for the Steward deal, and that Steward employees refused to sign them once they arrived at a meeting and realized Hennessy had been fired. Doc. No. 80 ¶ 56–57. The contract documents themselves are not in the record and Hennessey provides no foundation for his assertion that but for his termination Steward would have signed the contract documents.

## II.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party "has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). The Court is "obliged to [] view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). A court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## III. DISCUSSION

### A. Hennessy's Discrimination Claims

In Counts II and III of the Complaint, Hennessy alleges that Hillrom terminated his employment on the basis of his age or his gender, in violation of Mass. Gen. Laws ch. 151B, § 4. Doc. No. 1-1 ¶¶ 21–27. As Hennessy has not produced direct evidence that he was terminated because of age or gender, the Court utilizes the three-step burden-shifting framework the Supreme Court promulgated in McDonnell Douglas Corp v. Green, 411 U.S. 792, 802–05 (1973). See Ray v. Ropes & Gray LLP, 799 F.3d 99, 113 (1st Cir. 2015) ("Because [the plaintiff] has not offered 'direct proof' of [the defendant's] alleged discriminatory animus, 'we allocate the burden of producing evidence according to the now-familiar three-step framework set forth in McDonnell Douglas Corp. v. Green.'") (quoting Udo v. Tomes, 54 F.3d 9, 12 (1st Cir. 1995)); Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008) ("The familiar McDonnell Douglas framework governs . . . Massachusetts General Laws, chapter 151B claims."). Under McDonnell Douglas, Hennessy must establish a prima facie case of discrimination; if the showing is made, the burden of production shifts to Hillrom, who must establish a legitimate, nondiscriminatory justification for the adverse employment action. See Ray, 799 F.3d at 113. At the final step, Hennessy must show by a preponderance of evidence that Hillrom's justification is pretextual. Id. Throughout, Hennessy retains the "ultimate burden of persuasion" and must raise a genuine issue of material fact to avoid summary judgment. Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142–43 (2000)).

Hennessy has the initial burden of demonstrating a prima facie case of discrimination. To do so, he must provide evidence that: (1) he is a member of a protected class, (2) he performed his job "at an acceptable level," and (3) he was terminated. Bulwer v. Mount Auburn Hosp., 46

N.E.3d 24, 33 (Mass. 2016). Here, Hennessy cannot establish a prima facie case because his performance reviews establish that he was not performing at an acceptable level. Hennessy never met his annual sales goal in any year that he worked for Hillrom. In 2014, before he was terminated, he had the lowest sales performance of any of the five Account Executives in his region. Hennessy's managers repeatedly warned him in his performance reviews that he needed to improve his numbers to keep his job and placed him on a PIP that expressly said that his job was in "jeopardy." While Hennessy emphasizes the parts of his reviews where he met expectations (prior to 2012), see Doc. No. 80 ¶¶ 49–53, he does not dispute that he received these later negative performance reviews or that he was placed on a PIP.[3] Cf. Hillstrom v. Best Western TLC Hotel, 265 F. Supp. 2d 117, 124 (D. Mass. 2003) (finding no prima facie case of discrimination where employee "offers no evidence rebutting the essential accuracy of [employer's] dissatisfaction with his job performance"). Hennessy points out that he did well in 2011, the one year that he had an assistant. Doc. No. 80 ¶ 50. But that was years before both the PIP and his later termination. His success in 2011 is not enough to state a prima facie case. He also notes that he lacked an assistant afterwards, suggesting that this caused his poor performance. Hennessy provides no evidence that others in his role had assistants, or that the removal of his assistant in 2011 was discriminatory in any way. Indeed, in his roughly seven years as an Account Executive at Hillrom, Hennessy never complained of discrimination at all.

---

[3] Hennessy does challenge one aspect of his performance reviews—he claims that "1.7 million dollars should have been added to his total monetary compensation" in 2013. Doc. No. 80 ¶ 29. There is no factual basis in the record as to why Hennessy is entitled to an additional $1.7 million or how it would affect his 2013 review. Even if he were entitled to this sum, it does not change the fact that Hennessy did not meet performance goals for several years and failed to improve even after he was placed on a PIP.

Id. ¶ 47. Without a prima facie case, Counts II and III fail, and for this reason the Court allows the motion for summary judgment on these two counts.

 In any event, even if Hennessy could make out a prima facie case, Hillrom has shown a legitimate, nondiscriminatory reason for his termination. Hillrom claims that Hennessy was terminated because he did not meet his sales goals for multiple years. Performing below expectations is a legitimate, nondiscriminatory reason for termination. Rios-Jimenez v. Sec'y of Veterans Affairs, 520 F.3d 31, 42 (1st Cir. 2008) ("substandard performance" is a legitimate and nondiscriminatory reason to terminate); see also Sullivan v. Liberty Mut. Ins. Co., 825 N.E.2d 522, 540 (Mass. 2005) (employer "articulated a credible nondiscriminatory reason" for choice to terminate employee by showing it selected "on the basis of a history of sub-par performance evaluations") .

 Finally, Hennessy does not have sufficient evidence to show that the decision to terminate his employment was pretextual. His reviews and performance data stand unchallenged. At most, Hennessy points to two statements to support his discrimination claim: first, that Philbrick, his manager, said "how refreshing it is to see a young sales force" and second, that his colleague Iglehart reported that Philbrick said "he wanted to get women into the [Account Executive] position versus men." Doc. No. 80 ¶ 58. However, in the First Circuit, "[i]solated, ambiguous remarks are insufficient, by themselves, to prove discriminatory intent." Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 329 (1st Cir. 1996). Isolated statements are insufficient "even if made by a supervisor." Paul v. Murphy, 948 F.3d 42, 54 (1st Cir. 2020). The statements Hennessy provides are vague and devoid of context. They also have no clear connection to his termination, which further diminishes their ability to establish that his firing was pretextual. See Rivera-Aponte v. Rest. Metropol #3, Inc., 338 F.3d 9, 12 (1st Cir. 2003) (noting that "stray

workplace remarks" are generally insufficient to establish discriminatory animus and the "lack of a direct connection between the words and the employment action significantly weakens their probative value"). The totality of these two statements is insufficient to draw the inference that Hennessy was fired because he was male or because he was older. Nor does the fact that Hennessy was replaced with a woman, standing by itself and viewed in the totality of the circumstances under the summary judgment rubric, meet Hennessy's burden to show discrimination.[4]

Finally, Hennessy adds that Philbrick fired him before a multi-million-dollar deal with Steward could close "to cover up his discrimination" and because he wanted Hennessy "out of the picture" before the deal closed. Doc. No. 81 at 3, 5. These statements do not allege claims of age or gender discrimination. To the extent that statements about the Steward deal allege a Fortune claim, the Court reviews that issue below.

### B.  Hennessy's Implied Covenant of Good Faith and Fair Dealing Claim

In addition to his discrimination claims, Hennessy alleges in Count I of his Complaint that Hillrom violated the implied covenant of good faith and fair dealing by terminating his employment to avoid paying him commissions he would have earned on the deal with Steward Health Care. Doc. No. 1-1 ¶¶ 16–20. Developed as a limited exception to the long-standing rule that an employer may terminate an at-will relationship at any time for almost any reason, a so-called Fortune claim (derived from Fortune v. Nat'l Cash Register Co., 364 N.E.2d 1251 (Mass. 1977) and its progeny) accrues when an employer terminates an employee in bad faith in order to deprive him or her of commissions earned or almost earned. However, "the Fortune doctrine

---

[4] For these reasons, the Court need not resolve Defendant's assertion that one of the statements constitutes inadmissible hearsay.

does not protect interests contingent on an event that has not occurred." Harrison v. NetCentric Corp., 744 N.E.2d 622, 631 (Mass. 2001). It is undisputed here that Steward never signed a deal with Hillrom—neither Hennessy nor Philbrick nor anyone else at Hillrom earned commissions from the deal. Hillrom neither withheld any commissions from Hennessy nor unjustly enriched itself. See Kravetz v. Merchs. Distribs., Inc., 440 N.E.2d 1278, 1281 (Mass. 1982) (noting that the purpose of an implied covenant of good faith and fair dealing is to "prevent an employer from being unjustly enriched"). In addition, Hennessy has no evidence showing Hillrom acted in bad faith or that his termination was related to the Steward deal. The Fortune claim thus fails.

Further, Hennessy has no claim for tortious interference of advantageous relations.[5] To prevail, he would have to show "(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's intentional and malicious interference with it; (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct." Welch v. Ciampa, 542 F.3d 927, 943-44 (1st Cir. 2008) (citing Comey v. Hill, 438 N.E.2d 811, 816 (Mass. 1982)). Nothing before the Court shows that Hillrom intentionally or maliciously interfered with the Steward deal by firing Hennessy; rather, the record establishes a long history of below-expectations performance and escalated warnings that resulted in termination. The only support Hennessy provides for his claim is evidence establishing the temporal proximity of his termination to the conclusion of the deal with Steward, through the Irvine note and statements that the contract was ready to be signed. But the Irvine note only establishes that Irvine believed at some point during his tenure at Steward that Hennessy was key to the deal. Irvine states in his deposition testimony that he

---

[5] Defendant urges the Court to ignore this claim and argues that it was not properly pled in the Complaint. See Doc. No. 88 at 5. The Court does not address this point because Hennessy's claim for tortious interference of advantageous relations fails on the merits.

was in the process of leaving Steward and "probably wouldn't have been real aggressive chasing down a meeting" with anyone else about the deal after Hennessy left. Doc. No. 61-5 at 21–22. The contract Hennessy alleges that he was about to execute with Steward is not in the record, nor is any other information about the timing of the deal and his termination. In any event, the First Circuit has emphasized in other employment discrimination contexts that the timing of adverse employment actions should not be considered in a vacuum. Cf. Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 100-01 (1st Cir. 2007) (noting that for a retaliation claim, timing "may bear on the question of causation . . . but we have also warned that a 'narrow focus [on timing may] ignore[] the larger sequence of events and also the larger truth'") (citation omitted). The larger sequence of events here precludes an inference that Hennessy was terminated for bad faith or for any reason supporting a tortious interference claim. Hennessy has failed to set forth specific facts showing there is a genuine issue for trial on this count. Nothing supports the conclusion that Hillrom would intentionally pass on or sabotage a large sale. Thus, Count I of Hennessy's Complaint fails.

## IV.  CONCLUSION

For the foregoing reasons, Hillrom's Motion for Summary Judgment (Doc. No. 59) is ALLOWED.


SO ORDERED.


 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge